**John SCDORIS, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security Administration, Defendant.**

No. 4:01CV3283.

United States District Court,
D. Nebraska.

Oct. 9, 2002.

Mary S. Wenzl, Lincoln, NE, for Plaintiff.

Christian A. Martinez, Assistant United States Attorney, Omaha, NE, for Defendant.

## MEMORANDUM AND ORDER

KOPF, Chief Judge.

This is a social security appeal. Resolution of it turns mainly on whether the administrative law judge (ALJ) properly evaluated the claimant's credibility. Because the ALJ properly considered this question and any other assertions of error are not valid, I affirm the decision of the Commissioner. My reasons for this decision are set forth below.

### I. BACKGROUND

I first review the medical information. Then I review the ALJ's analysis.

#### A. Medical Information

The claimant sought social security benefits related to back injuries and episodic visual disturbances due to migraine headaches. (Tr. 40–42, 101–02.) He claimed disability starting after a work related injury on March 27, 1997. (Tr. 40.)

On March 27, 1997, while working as a crane and shear operator, Mr. Scdoris suffered a back injury. (Tr. 22.) Since that time, he has not engaged in any substantial gainful activity. (*Id.*)

Before his injury in 1997, the claimant injured his back and required an L4–L5 lumbar diskectomy in 1993 (Tr. 22.) He was treated by Dr. Daniel Ripa, M.D., and almost fully recovered such that he was able to return to work with the only restriction being that he should not lift in excess of 50 pounds at any one time. (Tr. 268.)

Regarding his 1997 injury, the plaintiff slipped on oil and injured his low back and neck. (Tr. 267.) Dr. Ripa diagnosed the problem in March of 1997 as a back sprain. (*Id.*) Later in May of 1997, he was hospitalized for severe low back and leg pain, but responded to treatment. (Tr. 266.) An MRI revealed "little to no scar tissue around the old surgical site and nothing to suggest a new compressive lesion." (*Id.*)

According to Dr. Ripa, in late May of 1997, the plaintiff was "doing much better" and was allowed to return to work with restrictions. (Tr. 265.) However, his return to work was not successful because his employer did not allow him to follow the work restrictions, and instead he "had to bend for over 8 hours a day." (*Id.*) On August 25, 1997, Dr. Ripa saw the plaintiff again. (Tr. 264.) At that time, the low back pain was "reasonably well controlled when he doesn't have to be overly active or bend or lift or twist." (*Id.*)

The plaintiff saw Dr. Bernard Kratochvil, M.D., for a second opinion in August of 1997. (Tr. 230–32.) Dr. Kratochvil diagnosed a "lumbar strain/sprain" (Tr. 231) and x-rays showed no significant problems. (Tr. 231.) Dr. Kratochvil was of the opinion that surgery was not warranted (*id.*) and if physical therapy did not help a functional evaluation should be pursued (Tr. 232). The doctor suggested that the plaintiff might not be able to return to his previous work if the pain persisted. (*Id.*)

Mr. Scdoris also saw Dr. Michael T. O'Neill, for a third opinion, in October of

1997. (Tr. 237–39.) At that time, the plaintiff appeared to the doctor as a man "having intractable back and leg pain and numbness" but "all of these are subjective complaints" and his "only objective abnormal physical finding is a positive straight leg raising test which also, at least in part, is subjective in nature." (Tr. 238.) The doctor reviewed the prior x-rays and MRI which showed "very mild disc bulging" at L4–L5 and "some minimal degenerative changes at L5–S1 but there is no evidence of true disc herniation or significant spinal stenosis...." (*Id.* at 238.) The doctor recommended a "repeat MRI or even a lumbar myelogram with a post-myelogram CT scan." (Tr. 238–39.) If those were normal, the doctor believed that "he should have a functional capacity evaluation and be rated."[1] (*Id.*) At the time of the examination, the doctor did not feel that the plaintiff could return to his work. (*Id.*)

In early 1998, the follow-up MRI recommended by Dr. O'Neill was conducted. (Tr. 347.) According to the doctor, "This a fairly *normal* MRI" which showed "bulge at C6–C7 level" and "*[n]o* disc herniation." (*Id.*) (Emphasis in original.) Surgery was not indicated. (*Id.*)

The plaintiff underwent physical therapy and work hardening from December of 1997 through February of 1998. In a December of 1997 functional capacity evaluation conducted as a part of that therapy the claimant's testing was determined to be invalid due to his scores on the "validity profile," but the physical therapist stated: "I would estimate that Mr. Scdoris could work at the MEDIUM physical demand level and possibly higher." (Tr. 244.) (Capitalization in original.) At the conclusion of the therapy in February of 1998, the physical therapist recommended discontinuation of the work hardening effort, and that the claimant "should look for work at the MEDIUM physical demand

level or below." (Tr. 241.) (Capitalization in original.)

In the fall of 1998 (Tr. 261–264) the claimant returned to Dr. Ripa, complaining of stiffness in his legs and reduced leg mobility. (Tr. 264.) Dr. Ripa ordered another MRI, and that test showed: (1) "bulge of the disk at L4–5 though I would not consider it to be a recurrent herniation"; (2) "He doesn't have any severe evidence of compression"; (3) "degenerative change in the lower two lumbar disks which would be expected based on his history and prior surgery." (Tr. 262.) The doctor did "not see anything in my estimation that would necessitate surgical intervention in his low back. (Tr. 262–61.)" (Pages not in order.)

In January of 1999, the plaintiff saw Dr. Ripa again. (Tr. 261.) At that time, the doctor believed that Mr. Scdoris suffered from lumbar disk degeneration and prior lumbar disk herniation. (Tr. 261.) He suffered low back spasms and tingling into the right thigh. Since he had resumed smoking, "he is not a candidate for surgery." (*Id.*) The doctor suggested that the claimant "utilize the multi disciplinary approach at Madonna Rehabilitation for trying to optimize his therapies, his psychologic counseling, help with nicotine cessation and see if vocational options could be further explored" and the doctor made a referral for that purpose. (*Id.*)

The claimant underwent treatment at the Madonna Rehabilitation center pursuant to Dr. Ripa's referral for about two months in January and February of 1999. (Tr. 271–89.) During the therapy, the claimant was able to touch his ankles, and raise his legs to 80–90 degrees with "mild low back pain." (Tr. 280.) There were no complaints of "radicular pain" but there was "tenderness" in the back upon palpation. (*Id.*) The therapy ended when the

---

1. Throughout this period, the plaintiff was also pursuing a workers' compensation claim.

workers' compensation insurer refused to pay for further treatment. (Tr. 281.)

Mr. Scdoris saw Dr. Ripa again in May of 1999. (Tr. 320.) At that time, Dr. Ripa noted that "he can actually forward flex fairly well bringing his finger tips below the knee caps" but he continued to have low back pain. (*Id.*) Because the patient continued to smoke, Dr. Ripa would not consider further surgery such as a fusion. (*Id.*) The doctor encouraged the patient "to use full doses of over the counter anti-inflammatories." (*Id.*) The diagnosis was "[d]egenerative lumbar disk disease[,][t]obacco abuse[,][and] [c]ervical spondylosis." (*Id.*)

In June of 1999, the plaintiff saw Frederick A. Mausolf, M.D., for complaints of intermittent episodes of loss of vision with black spots. (Tr. 290.) Seeing no disease of the eyes, Dr. Mausolf concluded that the patient was "suffering from a migraine variant...." (*Id.*)

In October of 1999, and shortly before the hearing before the ALJ, Mr. Scdoris, at the suggestion of Dr. Ripa, consulted Dr. Longley at the Nebraska Spine Center. (Tr. 352–54.) Dr. Longley reviewed the plaintiff's history regarding the injury including all of the prior radiography work. He examined the claimant and performed various tests. Among other things, he found that the patient's "range of motion in the hips is normal bilaterally" and that "[s]traight leg raising on the right side is to 75 degrees causing low back pain" and "on the left is to 60 degrees causing low back pain." (Tr. 353.)

The doctor gave the following diagnosis: "1) Lumber disk degeneration, L4–5, L–5–S1"; "2) Nicotine dependence" and "3) Status post right L4–5 diskectomy." (Tr. 354.)

Dr. Longley stated: "The patient has complaints of primarily lower back pain with no neurologic deficits. MRI scan demonstrates degenerative changes at L4–5 and L5–S1." (*Id.*) Dr. Longley did not recommend surgery, suggesting instead that the surgical alternative be pursued "only if he is severely disabled by his symptoms." (*Id.*)

### B. ALJ's Decision

The ALJ found the plaintiff suffered from "degenerative disc disease of the cervical and lumbar spine and is status post L4–5 hemilaminectomy." (Tr. 23.) This constituted a " 'severe' impairment" (*id.*) and the claimant could not return to his past relevant work (Tr. 30). Discounting the plaintiff's claims of total disabling pain (Tr. 24–27), and after consulting a vocational expert (Tr. 28, 84–98), the ALJ found that the plaintiff could do "light benchwork," "light packaging," "sedentary benchwork," and "sedentary packaging." (Tr. 30.) Those types of jobs existed in significant numbers in the economy. (*Id.*) Therefore, the ALJ denied the claim for benefits.

In discounting the plaintiff's credibility regarding totally disabling pain, the ALJ considered and applied *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir.1984). (Tr. 24.) The ALJ noted that the plaintiffs' "complaints suggest a greater severity of impairment than can be shown by the objective medical evidence alone." (*Id.*) "However, a decision cannot be made based on objective evidence alone." (*Id.*)

Examining the factors mentioned in *Polaski,* the ALJ found that the claim of totally disabling pain was not credible for, among other reasons, the following: (1) during the period the plaintiff was claiming disabling pain, he went to 100 job sites looking for work thus indicating that he thought he could do some type of work (Tr. 25)[2]; (2) the claimant did not seek

---

2. The ALJ found that his prior work experi- ence neither enhanced nor detracted from the

treatment from his main physician Dr. Ripa between August of 1997 and September, 1998 (*id.*); (3) there were no prescriptions for strong pain medication (*id.*); (4) referring in part to a letter from the claimant's workers' compensation lawyer, the plaintiff had a motivation not to do well in physical therapy since the workers' compensation insurer was paying the bill and the plaintiff was seeking both temporary and permanent workers' compensation benefits (*id.*); (5) despite the fact that Dr. Ripa told the plaintiff that he could not perform surgery to try to alleviate pain unless Mr. Scdoris quit smoking, the plaintiff continued to smoke thus indicating that the pain might not be as severe as the plaintiff indicated (Tr. 25–26); (6) the radiographic evidence showed degenerative changes and small disc bulges but no "frank herniation" or "evidence of impingement" (Tr. 26); (7) some of the examinations by the doctors revealed "a series of pain flares rather than constant symptoms" (*id.*); (8) while the plaintiff complained of frequent and severe headaches, there was no objective corroboration in the medical evidence, there were no consistent reports of such problems, and there were no prescriptions for pain medication related to headaches (*id.*); (9) despite the plaintiff's claim that he could not remain upright for 8 hours and had to lie down or nap frequently, such problems were not reported in the medical records (*id.*); and (10) the plaintiff underwent a functional capacity evaluation that indicated he could work at the medium physical demand level (*id.*).

## II. REVIEW

 According to *Polaski*, the ALJ must consider the claimant's prior work record, observations by third parties, and

plaintiff's credibility since "he worked fairly steadily but at a low level of earnings." (Tr.

observations by treating and examining physicians as they relate to (1) the daily activities of the claimant; (2) the duration, frequency, and intensity of pain; (3) precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; and (5) functional restrictions. *Polaski*, 739 F.2d at 1322. Once having fairly considered those factors, it is up to the ALJ to decide the credibility issue. *See, e.g., Davis v. Apfel*, 239 F.3d 962, 968 (8th Cir.2001) (affirming finding that 50-plus–year–old sewing machine operator with tenth grade education still had residual functional capacity for unskilled light work with "sit and stand" option, even after injury to her back resulted in diskectomy and hemilaminectomy of her lumbar spine and in the face of a conclusory statement from treating physician that the claimant was disabled). In other words, subjective complaints of pain may be discounted if there are " 'inconsistencies in the evidence as a whole' " such as "discrepancies between [the claimant's] allegations of pain and [his] treatment history, medicinal selections, and daily activities...." *Id.* (quoting *Polaski*, 739 F.2d at 1322).

 In this case, the plaintiff complains about each of the reasons advanced by the ALJ as a basis for discounting the plaintiff's credibility. Essentially, Mr. Scdoris argues that record also supports a different credibility inference for each of the points mentioned by the judge. However, I "may not reverse merely because substantial evidence also exists that would support a contrary outcome, or because [I] would have decided the case differently." *Id.* at 966. Therefore, I reject the claimant's assertion of error regarding the particulars of the ALJ's credibility assessment. In reality, that assignment of error

25.)

amounts to nothing more than a disagreement with the ALJ's credibility conclusion and that conclusion is supported by substantial evidence in the record as a whole.

Three points, however, merit a brief, but slightly more detailed, response. I turn to those issues next.

First, the plaintiff states that he testified that he did not seek prescription medications because he had a past history of drug and alcohol abuse and did not want to get addicted to pain medications. (Tr. 68–69.) Thus, he argues that it was inappropriate for the ALJ to discount his claims of pain for lack of evidence regarding stronger medication.

While it is true that the plaintiff testified about those fears, the medical facts are that he did not take and was not prescribed stronger pain medications, and these facts are relevant to questions regarding the severity of pain under *Polaski*. Moreover, it was not wrong for the ALJ to disregard the plaintiff's fear of addiction while under medical supervision as an unworthy excuse. As Judge Beam has said in a similar case, "There was no showing that [the claimant's] fear of addiction was reasonable." *Soger v. Railroad Ret. Bd.*, 974 F.2d 90, 94 n. 2 (8th Cir.1992) (applying *Polaski* and affirming denial of benefits where claimant had undergone surgery for removal of herniated lumbar disc) (citation omitted).

In this regard, the only medical evidence that stronger pain medications might be contra-indicated was a fleeting reference by Dr. Longley to the plaintiff's fear. (Tr. 352 ("He is wary of taking pain medications as he is a recovering alcoholic and drug addict.").) That is, there no medical evidence that any of the physicians came to a reasoned conclusion that he or she could not appropriately manage prescription medications because of some unusual or uncontrollable addiction problem suffered by the plaintiff. In the end, the plaintiff was entitled to rest upon his fears about strong pain medications, but the ALJ was also entitled to believe that such reliance showed that the pain was not as severe as Mr. Scdoris claimed.

Second, the plaintiff complains that the ALJ evaluated his credibility with Mr. Scdoris' workers' compensation claim in mind. Ordinarily, the use of workers' compensation claims for credibility determinations in social security cases is problematic. *Compare McKinney v. Apfel*, 228 F.3d 860, 864 (8th Cir.2000) (affirming ALJ's adverse credibility determination in work-related neck injury claim for social security benefits due in part "to the fact that McKinney had reopened a workers' compensation claim") *with Erickson v. Sullivan*, 930 F.2d 654, 656 (8th Cir.1991) ("In discounting Erickson's complaints of pain, the ALJ also referred to Erickson's past workers' compensation claims. However, as this is neither evidence of inconsistencies in the record nor of the *Polaski* factors, we question its relevance."). *See also Hinton v. Massanari*, 13 Fed.Appx. 819, 820 n. 1 (10th Cir.2001) (unpublished) (suggesting that the ALJ's comment that "the monies [the claimant] received and might receive with respect to Workers' Compensation claim may possibly have given claimant less motivation to return to the work force" was "improper.") However, in this case, given a specific piece of evidence that was received at the social security hearing without any objection by the claimant's lawyer, there was no reversible error.

Part of the evidence was a detailed two-page letter, dated December 22, 1998, to the claimant from his workers' compensation lawyer. (Tr. 142–43.) It outlined the financial benefits of continuing to seek temporary disability benefits and physical therapy under the workers' compensation laws as compared to the financial rewards

of ending therapy and seeking permanent disability benefits under those laws. The lawyer also told the claimant about what the medical record would have to reveal in order to continue to receive temporary benefits and what the medical record must reveal in order to receive permanent disability benefits. The letter also estimated the amount of money per week the claimant could receive depending upon the percentage of his permanent disability. All of that advice was coupled with the reminder that "I also advised you to consider applying for Social Security benefits. Making this application would have no adverse effect on your Workers' Compensation claim." (*Id.* at 2.)

At the beginning of the social security hearing, this letter was offered into evidence by the ALJ as a part of a mass offering of exhibits. (Tr. 39 (referring in part to the "D exhibits"; the letter is found at Exhibit 2D).) Claimant's counsel, who was not the workers' compensation lawyer, stated that she had no objection to the receipt of the evidence. (*Id.*)

As the ALJ did, the letter can be construed as an outline about how to manipulate the medical evidence to achieve a certain end. In an earlier functional capacity evaluation the claimant's testing was found to be invalid due to his scores on a "validity profile." (Tr. 244.) Thus, there was a reasonable record-based concern about whether the plaintiff was trying his best in therapy, and the lawyer's letter was not irrelevant to that question.

In short, given the fact that the claimant had a lawyer at the social security hearing, that the lawyer did not object to the receipt of the letter into evidence, that the claimant had an opportunity to address the letter at the hearing if he had wanted to do so, that the workers' compensation issue was relevant to the question of whether the claimant was trying his best in therapy given the fact that the claimant had

flunked a "validity profile," and that the reference to the workers' compensation evidence by the ALJ was only one of at least 10 separate reasons given for doubting the claimant's credibility, the ALJ's reference to the workers' compensation evidence was not error requiring reversal.

Third, the plaintiff complains that the ALJ did not completely adopt the functional limitations set forth by Dr. Ripa in a questionnaire sent to the doctor by the claimant's lawyer, and that such a failure requires reversal. For two reasons, I disagree.

In fact, even though she did not personally adopt each limitation, the ALJ asked the vocational expert to utilize Dr. Ripa's check list. (Tr. 90.) The vocational expert did so, and then the expert stated that even with those limitations the claimant "could perform the sedentary sit/stand jobs" that the expert had previously identified as being open and available to the plaintiff. (Tr. 91.) Indeed, plaintiff's counsel followed up on that questioning, and the vocational expert confirmed that if the expert followed the limitations set forth by Dr. Ripa "he could do the jobs with the alternating sitting and standing [option]" including "assembly, packaging, order clerk...." (Tr. 97.) Thus, whether the ALJ fully adopted Dr. Ripa's limitations or not there was no harm to the plaintiff since even if the ALJ had adopted Dr. Ripa's exact views the result would have been the same.

■ Moreover, and as the ALJ pointed out, Dr. Ripa's restrictions set forth in the questionnaire were far more limited than the medical records from Dr. Ripa and other medical providers indicated were necessary. (Tr. 27.) When there is a mismatch between what a treating doctor states as his opinion about functional limi-

tations, and all the other medical evidence, the ALJ is not bound to adopt the treating doctor's unexplained and inconsistent opinion. *See, e.g., Hogan v. Apfel,* 239 F.3d 958, 961 (8th Cir.2001) (The ALJ did not err in discounting the inconsistent and unsupported portions of treating physician's medical source statement, where the ALJ found that the limitations detailed in the statement stood alone and were never mentioned in the physician's numerous records of treatment and were not supported by any objective testing or reasoning which would indicate why the claimant's functioning needed to be so restricted).

### III. CONCLUSION

There is no doubt that the plaintiff had a bad and painful back. The medical evidence, however, did not support a finding of total disability within the meaning of the social security laws, and the plaintiff was not entirely credible when it came to his complaints of totally disabling pain. In summary, the ALJ's credibility determination was not legally erroneous, and there are no other reasons that would justify reversal.[3]

---

**3.** To the extent the plaintiff in passing asserts other arguments for reversal, I deny those as well.